UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

KAREN C. THIELE,

Plaintiff,

v.                                                    Case No.  5:04-cv-486-Oc-10GRJ

COMMISSIONER OF SOCIAL SECURITY,

Defendant.
_____

## REPORT AND RECOMMENDATION[1]

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits. (Doc. 1.)  The Commissioner has answered (Doc. 4), and both parties have filed briefs outlining their respective positions.  (Docs. 10 & 11.)  For the reasons discussed below the Commissioner's decision is due to be **AFFIRMED.**

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on May 14, 2001, alleging an onset date of August 25, 1999.  (R. 82.) Her claim was denied initially and upon reconsideration.  (R. 62, 67, 70, 74.) Plaintiff requested a hearing before an Administrative Law Judge, which was held on December 5, 2002.[2]  On March 13, 2003, following the hearing, Administrative Law Judge Arthur W. Stacy (the "ALJ") issued a

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

[2] The relevant period of insured disability for this claim runs from the alleged onset date of August 25, 1999 through June 30, 2001.  Plaintiff's hearing took place almost a year and a half after the expiration of this period.

decision unfavorable to Plaintiff.  Plaintiff's request for review of that decision was

denied by the Appeals Council on September 23, 2004, rendering the ALJ's decision the

final decision of the Commissioner.  (R. 4-6.)  On November 3, 2004, Plaintiff filed the

instant complaint challenging the Commissioner's final decision.  (Doc. 1.)

## II.  ISSUES PRESENTED

The Plaintiff raises four issues on appeal.  First, Plaintiff argues that the ALJ

failed to address her right foot impairment, carpal tunnel syndrome, and shingles in his

assessment of Plaintiff's residual functional capacity (RFC).  Second, Plaintiff contends

that the ALJ did not develop the record adequately with respect to Plaintiff's mental

impairments.  Third, Plaintiff challenges the ALJ's failure to take vocational expert

testimony concerning Plaintiff's nonexertional impairments of pain and depression.

Finally, Plaintiff also challenges the ALJ's reliance on the Grids instead of utilizing

vocational expert testimony to determine if there was work in the present economy the

Plaintiff could perform.[3]

The Commissioner also raises four issues in order to rebut the challenges made

by the Plaintiff.  First, the Commissioner contends that the Court should only consider

medical evidence from Plaintiff's insured period, or from August 25, 1999, the date of

the alleged onset of disability, through June 30, 2001, the date Plaintiff was last insured.

Second, the Commissioner argues that Plaintiff's complaints of pain are not credible

---

[3] While the Court will address Plaintiff's claim that a vocational expert should have been called at step four to address the issue of nonexertional impairments and past relevant work, the ALJ found that Plaintiff could do her past relevant work. As a result, the ALJ did not proceed to step five of the analysis, and therefore was not required to use the grids or a vocational expert.  Accordingly, Plaintiff's argument that the ALJ erred by relying upon the Grids is inapposite to this case and will not be discussed further in this Report and Recommendation.

and not supported by the substantial weight of the evidence in the record.  Third, the

Commissioner asserts that there was substantial evidence in the record to support the

ALJ's finding that the Plaintiff could perform her past relevant work as a bartender and

office cleaner**,** especially in light of the fact that she worked during the period for which

she was claiming disability.  The Commissioner also contends that because Plaintiff

could perform her past relevant work, it was not necessary for the ALJ to obtain

vocational expert testimony.  Finally, the Commissioner argues that the Court should

only consider the evidence that was before the ALJ.  Alternatively, the Commissioner

argues that if the Court considers the additional evidence submitted to the Appeals

Council after the hearing before the ALJ, this cause should be remanded for a new

determination in light of that evidence.

## III.  <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[4]  Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[5]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

---

[4] *See* 42 U.S.C. § 405(g).

[5] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Commissioner's decision.[6]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[7]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[8]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[9]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[10]

The ALJ must follow five steps in evaluating a claim of disability.[11]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[12]  Second, if a claimant does not have any impairment or combination of impairments which

---

[6]Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[7]Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[8]Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[9]42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

[10]42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[11]20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[12]20 C.F.R. § 404.1520(b).

significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[13]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[14]  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[15]  Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[16]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[17]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[18]  The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[19]

---

[13]20 C.F.R. § 404.1520(c).

[14]20 C.F.R. § 404.1520(d).

[15]20 C.F.R. § 404.1520(e).

[16]20 C.F.R. § 404.1520(f).

[17]Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[18]Doughty, 245 F.3d at 1278 n.2.  In Doughty the court explained this burden shifting as follows:
    In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[19]Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[20]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[21]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[22]  Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[23]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## IV. <u>SUMMARY OF THE RECORD</u>

### A.  Personal Background

Plaintiff, born on October 29, 1952, was fifty years old at the time of the hearing before the ALJ.  She is married to her second husband and does not have any young children.  (R. 139, 82-83.)  She has completed two years of community college (R. 139,

---

[20]<u>Wolfe v. Chater</u>, 86 F.3d 1072, 1077 ( 11th Cir. 1996).  *See* <u>Jones v. Apfel</u>, 190 F.3d 1224, 1229 (11th Cir. 1999); <u>Walker</u>, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[21]<u>Walker</u>, 826 F.2d at 1003.

[22]<u>Wolfe</u>, 86 F.3d at 1077-78.

[23]*See id.*

6

96), two years of cosmetology school, and all but the last six months of a nursing program.  (R. 139.)  Plaintiff has worked at a number of jobs in the past fifteen years. Her past work experience includes employment as a certified nurse's aide ("CNA"), bartender, in the customer service and shipping and receiving departments of a retail store, and as an office cleaner.[24]

Until her alleged date of onset, Plaintiff had been working as a CNA, taking care of patients by bathing, feeding, and dressing them.[25]  This job required her to stand for a considerable amount of time during the day and involved lifting and carrying various objects which weighed up to one hundred pounds or more, including patients with the assistance of a hoyer lift device.  (R. 107.)

As a bartender, Plaintiff also walked or stood for most of the day and frequently lifted objects of twenty-five pounds.  When she worked in Customer Service, Plaintiff spent most of the day on her feet dealing with customer returns.  Her duties also included restocking shelves and frequently required that she lift objects of twenty-five pounds.  (R. 111.)  Prior to this job, she worked in the shipping and receiving department which required her to walk and stand for most of the day.  In this job she frequently lifted objects of twenty-five pounds with the heaviest objects weighing fifty pounds.  *Id.*  As an office cleaner, she spent most of her four hour work day walking or standing and lifting objects between twenty to twenty-five pounds.  (R. 112.)

---

[24] Although Plaintiff claims that she stopped working as of the date of her onset, there is conflicting evidence in the record as to whether Plaintiff continued working during the period for which she is claiming disability.  (R. 102, 197, 203, 433.)

[25] Plaintiff also worked as a CNA before her job as a bartender.  In that job, her patient care duties involved cooking, doing laundry, medication management, and lifting patients when necessary.  She frequently lifted objects of fifty pounds or more.  (R. 109.)

**B. Medical History**

The record contains, what appears to be most, if not all, of Plaintiff's medical records from October of 1992 through August of 2004.  Plaintiff has been treated for a number of chronic illnesses and other conditions which include asthma, vascular headache, shingles, uncontrolled brittle diabetes, obesity, porphyria, bugling discs, degenerative disc disease, high cholesterol, high blood pressure, depression, anxiety, GERD, TMJ, abdominal pain, blurred vision, gallbladder problems, chronic diarrhea, a colon polyp, an ulcer, internal hemorrhoids, dehydration, abdominal adhesions, arteriosclerotic disease, possible stroke, numbness in her right foot, right foot stress fractures, and recurring urinary tract and other infections.  (R. 90, 103, 122-23, 177, 306, 125, 413, 506, 137-138, 153, 141-142, 147, 151, 166, 184-185, 201-202, 413, 418, 420, 426-429, 432. ).

However, on appeal, the Plaintiff only challenges the ALJ's findings with respect to six of these conditions: right foot impairment, carpal tunnel syndrome, shingles, back pain (due to degenerative disc disease, spondylosis, and disc bulges), diabetes mellitus, depression and anxiety.  The Commissioner challenges the relevance of the medical evidence submitted to the Appeals Council, after the hearing before the ALJ, consisting of Plaintiff's medical records from 2003-2004, all of which post date Plaintiff's last date insured.  The Court will, therefore, focus its discussion on these six conditions and the medical evidence from 2003-2004.

**1. Right Foot Impairment**

In 1995, Dr. Kanter found hypertrophic degenerative changes and spurring in Plaintiff's right foot.  (R. 309-310.)  In 1996, Dr. Plotke found moderate degenerative

spurring in the right foot.  (R. 155.)  In August of 1999, Plaintiff had a right foot plantar fibroma removed as well as the removal of the right hallux in the dystrophic nailbed (*i.e.* the removal of her right big toe toenail).  The wound became infected causing cellulitis, and Plaintiff was put on antibiotics.  (R. 225, 227-230.)

    In March of 2000, Plaintiff went to see a podiatrist, Dr. Paul Bishop, about pain in her right foot.  In his letter to Plaintiff's primary care physician, Dr. Kenneth Kavanaugh, Dr. Bishop stated that Plaintiff had been working as a bartender, but due to the pain in her foot was finding it difficult to stand all day.  (R. 197.)  Dr. Bishop found that Plaintiff had "exquisite pain on palpation at the fourth metatarsal of the right foot at the metaphyseal-diaphyseal junction."  He also noted pain along the capsular-plantar region[26] and found early bone callus formation on the fourth metatarsal[27] on an x-ray. He diagnosed Plaintiff with a stress fracture of the fourth metatarsal in her right foot and treated her through use of a Unna boot, cast foot, and a Silo silicone tube for scarring on her right hallux.  *Id.*

    In a radiology report by Dr. James Studlo in March of 2000, Dr. Studlo noted that Plaintiff's right foot had considerable spurring of the calcaneus at the Achilles insertion and the plantar aspect,[28] but noted that the foot cast obscured the fine bony detail.  Due to this, he did not see any fracture or dislocation.  (R. 198.)  In a body bone scan performed to examine Plaintiff's complaints of joint pain in April 2000, Dr. Parkash

---

[26] In other words, the bottom of Plaintiff's foot.  2-6 <u>Attorneys' Textbook of Medicine</u> P 6.00 (3d ed. 2005).

[27] In layman's terms, Plaintiff's fourth toe. *Id.*

[28] In other words, Plaintiff is developing a heel spur.  *Id.*

Talwar noted that examination of the Plaintiff's shoulder, knee, ankle, and foot joints showed a post degenerative joint disease process.  (R. 207.)

### 2.  Carpal Tunnel Syndrome

In May of 1993, Dr. Richard A. Nelson, a neurologist, evaluated Plaintiff.  He found that she had a "significantly abnormal electrodiagnostic study which consists of marked delay in the distal motor and sensory latencies of both median nerves."[29] (R. 143.) He speculated that the delay was due to her carpal tunnel syndrome and not a peripheral neuropathy secondary to her diabetes.  *Id.* Dr. Nelson proposed conservative treatment with wrist splints, although he speculated that surgery would most likely be necessary due to the significant denervation of Plaintiff's abductor pollicis brevis muscle. [30] (R. 143-145.)  Dr. Kavanaugh's notes from November 10, 1993 and January 6, 1998 include references to the fact that Plaintiff had surgery for carpal tunnel repair. (R. 342, 455.)

### 3.  Back pain and shingles

Dr. Kavanaugh's clinical notes from March 20, 1997 show that the Plaintiff complained of her right leg becoming numb and falling out from under her.  (R. 282.) Radiologist Calin Caluser in January of 1997 found that Plaintiff had degenerative disc disease at T11-T12, T12-L1 and probably T10-T11.  (R. 284.)  In October of 1997, Plaintiff went to see Dr. Studlo who examined her thoracic spine and noted moderate spurring and some evidence of degenerative disc disease.  (R. 200.)  In March of 1998,

---

[29] Carpal Tunnel Syndrome is marked by median nerve compression in the wrist. 1-3B <u>Attonreys' Textbook of Medicine</u> P3B.50 (3d ed. 2005.)

[30] Weakness in this muscle in the wrist gives the best evidence of carpal tunnel syndrome.  *Id.*

Plaintiff consulted with Dr. Martin E. Gryfinski ("Dr. Gryfinski"), a neurosurgeon, about an onset of back pain and spasms.  (R. 163.)  He noted that she had impaired motion in her spine and diminished reflexes in her knees and ankles, but normal strength in her lower extremities.  (R. 163.)  In September of 1998, Plaintiff also suffered from back pain due to complications with a laproscopic cholecystectomy[31] and drainage of the site after the surgery.   No evidence of spinal involvement or diskitis was found to explain the right upper back pain at that time (R. 184-185), but she was diagnosed with shingles and received seventeen nerve blocks which completely relieved the pain.  (R. 432.)

In 2000, Plaintiff began seeing Dr. Himanshu S. Kairab in Florida.  (R. 514.)  In October of 2000, her back pain reoccurred.  She was then treated with Vicodin, but her symptoms worsened and radiated across her low back until December 2000 when she developed a rash on her right big toe. She was finally diagnosed with a recurrence of shingles and treated with Valtrex.  The treatment cured the rash, but the pain, her doctor noted based on Plaintiff's complaints, was "excruciating" and traveled down her body. (R. 502-505.)  An MRI performed in November of 2000 revealed minimal degenerative spondylosis of the lumbar spine without acute abnormality and mild to scattered spondylosis of the thoracic spine without acute abnormality.  (R. 437.)

In March of 2001, Plaintiff consulted with Dr. Stephen T.  Pyles upon referral by her physician, Dr.  Kairab, about treatment for chronic recurring low back pain.  (R. 432.)  Plaintiff told Dr. Pyles that the pain continued to be situated in her low back and radiated down her right hip, thigh, and calf.  She described the pain as a "constant

---

[31]This procedure was done to remove Plaintiff's gallbladder.

burning, like raw skin" which was relieved somewhat by heat, Vicodin, or Oxycotin.  It was exacerbated by activity or position and the cause was found to be hyperesthesias[32] and allodynia.[33]  *Id.* The pain sometimes caused her sleeping problems, and she took Valium to remedy this.  (R. 433.) The Plaintiff told Dr. Pyles that she had not worked by her own choice since May of 2000 because of her pain.[34]  (R. 433, 444.)

Upon physical examination, Dr. Pyles noted that her strength was 5/5 in all four extremities, she had no focal sensory deficits, some mild difficulty with heel and toe walking, but had a normal range of motion in all major joints. She had diffuse tenderness in the low back between L4 to S1, which was particularly tender on her right side.  (R. 434-435.)  Pyles' impression upon examination was chronic low back pain due to lumbar disc disease and possible postherpetic neuralgia in L5-S1.  He recommended epidural corticosteroid injections, and an MRI of the lumbar spine.  (R. 435.)  The MRI was performed a week later and showed moderate degeneration in the lower thoracic spine.  There was no nerve root compression and only mild disc bulges at L-3-4, L-4-5 and L-5 -S-1.  (R. 436.) No notation was made of any restrictions or limitations on Plaintiff's daily habits, aside from ceasing to work as a bartender in May of 2000, due to pain.  In April 2001, Plaintiff returned to Dr. Pyles for a second round of corticosteroid injections.

---

[32] Hyperesthesias is defined as an "abnormal sensitivity to stimuli when the area is touched or an exaggerated response to mild pain, is caused by nerve root irritation."  4-10A Attorneys' Textbook of Medicine P10A.44(2) (3d ed. 2005).

[33] Allodynia is defined as "the sensation of pain caused by a normally nonpainful stimulus such as a light touch."  12-100 Attorneys' Textbook of Medicine P 100.40 (3d ed. 2005).

[34] Plaintiff also told Dr. Stromborg that she was working part-time in April of 2000.  (R. 203.)

### 4. Diabetes Mellitus

Plaintiff was diagnosed as a Type II diabetic in 1988 and was placed on insulin and asked to monitor her blood sugars in 1990 or 1991.  (R. 38, 39, 203, 213, 225, 231A, 232, 232A, 249, 351-352, 378-379, 381-385.)   During the time period relevant to this appeal she had only three incidences of complications from her diabetes documented in the record.  First, in March of 2000, Plaintiff went to see her doctor when she became ill.  He found that her diabetes was under poor control at that time due to treatment of a recent infection.  (R. 214-215, 217.) Second, her blood sugar levels had to be checked before she received the corticosteroid injections for her back pain in 2001 to make sure they were in acceptable limits.  (R. 435.) At that time, Dr. Pyles noted that Plaintiff suffered from mild bilateral lower extremity neuropathy due to her diabetes.

Lastly, in September of 2001, Plaintiff was admitted to St. Anthony Medical Center when she claimed to not be feeling well and passed out.  Dr. Spencer Markowitz and Dr. Jeffrey Thompson treated her.  Prior to her admittance, her diabetes was highly uncontrolled with blood sugar levels ranging from below 100 to over 500.  (R. 455.) However, Dr. Markowitz found her diabetes to be a secondary problem to the dehydration for which she was initially admitted to the hospital.  Her blood sugar difficulties prior to her admittance may have been due to her dehydrated condition (R. 461), and  Dr. Markowitz noted that while in the hospital, her blood sugar levels had not been as variable.  Records of Plaintiff's daily blood sugar readings for nine months

between January 2002 and December 2002 were also presented to the ALJ for consideration after the hearing.[35]  (R.  541-561A.)

### 5.  Depression and Anxiety

In 1992, Plaintiff attempted suicide with a drug overdose (R. 315) and was treated at various times with Zoloft, Prozac, and Ativan.  (R. 139, 383.)  In August of 1996, Dr. Charles Berthold, a psychiatrist, examined Plaintiff and diagnosed her with an anxiety disorder with some depressive features.  She was not on any psychotropic medications at that time, and showed no evidence of thought disorder or perceptual problems.  Her short- and long-term memory were in tact, and she denied suicidal thoughts.  (R. 140.)  At the time of this examination, Dr. Berthold recommended that Plaintiff consult with Dr. Saduskas about medication management and get more physical exercise, engage in relaxation exercises, and return for counseling as needed. (R. 140.)

### 6.  Plaintiff's Testimony And Other Evidence[36]

Plaintiff claims that many of the above described ailments have caused her to experience pain at the time they occurred.  (R. 90, 103.)  As of June 18, 2001, Plaintiff took Vicodin twice a day.  She claimed it helped most, but not all, of the time to relieve her pain.  (R. 104.)  Plaintiff also was prescribed Demerol for severe pain, but she

---

[35] These records presumably were submitted to show that Plaintiff's diabetes was not controlled due to the variation in her blood sugar level on any given day. However, the ALJ was not required to consider evidence from 2002 because the relevant period of Plaintiff's claimed disability was from August 25, 1999 through June 30, 2001.

[36] Much of Plaintiff's testimony at the hearing related to her condition at that time, in December 2002.  Plaintiff's insured status ended on June 30, 2001, almost a year and a half before Plaintiff testified. Accordingly, the Court primarily addresses in this section those portions of Plaintiff's testimony and evidence which relates to her condition during the insured period.

testified that she does not take that medication very often.  (R. 38-39.) Plaintiff testified

that the medications make her feel dazed and to that extent interfere with her ability to

concentrate and focus on a task.  (R. 44.) Her husband helped her at times when she

was in pain with most of her daily living activities such as cooking, bathing, and

shopping. (R. 104, 116,  43, 49.)  She was sometimes able to do housework.  (R. 104.)

She had not driven in four months due to the pain medication she was taking.  (R.105,

116.)  Plaintiff also took Elavil for sleeping problems.

Plaintiff described that she has low levels of energy caused by the fluctuations in

her blood sugar as result of her brittle diabetes.  She claims that insulin controlled her

diabetes between 1993 and 1999 so that she could work, but when the insulin failed to

control her diabetes she felt sick most of the time.  (R. 41.) Plaintiff testified that she last

worked in 1999.[37]  She said that she could not work due to her diabetes because she

could not bring her insulin injections to work. (R. 29.) She also  testified that when she

and her husband moved to Florida in October of 1999 she attempted to get work, but

realized she would have difficulty keeping a job because she felt sick most of the time.

(R. 46.)

With respect to her physical condition during the insured period, Plaintiff testified

that in 1999 she had about three migraines a month due to problems with the vertebrae

in her neck.  (R. 29.)  She also testified that she had constant numbness in her feet and

hands due to the diabetes.  This numbness caused her to have trouble gripping objects.

---

[37] Various doctors noted in her records that she was working through 2000.  (R. 197, 203.)

(R. 30.)  She claimed that her hands have returned to the way they were prior to her surgery in 1993 for carpal tunnel syndrome and that she has poor circulation.  (R. 31.)

She described having constant low back pain in 1999 and 2000, which on a scale of one to ten registered at a seven.  (R. 33.)  She also claimed that the vericose veins in her legs cause leg pain which varies depending on how long she has to stand.  Three years ago she could stand on her feet for three to five hours with breaks, or two and a half to three hours without breaks.  She claimed that her ability to stand for extended periods of time worsened the last time she had shingles in 2000.  (R. 35.) She testified that in 2001 she could probably walk a couple of blocks and that the doctor suggested she get a bike for exercise but she had trouble riding it.  (R. 45.)

Plaintiff also testified that she could only lift five pounds or half a gallon of milk if she did not have to carry it very far.  (R. 31.)  She claimed to be able to walk somewhere between ten to thirty minutes, but that sitting on an average day was not difficult unless her sciatica nerve bothers her.  (R. 36.)  When that occurred she could sit, but could not put any weight on the back of a chair.  In 2000, she claimed she could not sit when she had shingles, and that even when her condition improved, she still retained some residual back pain.  (R. 37, 45.)  She testified that without the shingles she could sit for an hour or two.  (R. 46.)

### 7.  Agency Physicians' Assessments of Plaintiff

The agency physician reviewed Plaintiff's records  in July of 2001 and completed an assessment of her residual functional capacity.  He found that she could occasionally lift twenty pounds, frequently lift ten pounds, stand and /or walk or sit a total of about six hours in an eight hour workday, and had some limited use of her upper extremities for

pushing and or pulling.  He found she could frequently climb a ramp or stairs but should not do work on a ladder, rope, or scaffold.  Plaintiff had some postural limitations in her ability to balance, but no limitations were found in the frequency with which she could stoop, kneel, crouch or crawl.  (R. 449.)  No other limitations were place on Plaintiff's abilities except for the environmental limitations to avoid concentrated exposure to vibrations and hazards.  (R. 451.)  The physician based his conclusions upon finding that Plaintiff's mild neuropathy was secondary to her diabetes mellitus,[38] her shingles had improved by 80%, and her claims of degenerative disc disease did not appear to a moderate or severe degree in exams or on the MRIs her doctors performed.  (R. 452.)

A different agency doctor completed another RFC assessment in October 2001. The only difference in his findings were increased postural limitations.  He concluded that Plaintiff should only climb a ramp or stairs, balance, stoop, kneel, crouch or crawl occasionally. He made such recommendations due to her back problems and possible neuropathy (R. 485), but found that her degenerative disc disease was of no clinical significance and that she had no demonstrated signs of neuropathy.  (R. 488.)

### 8.  Medical records from 2003-2004

On March 3, 2003, Dr. Stephen Miller, Plaintiff's podiatrist, examined Plaintiff on February 27, 2003 after she stubbed her right foot on a chair eight days before the exam. (R. 565.)  At that time, Dr. Miller found that Plaintiff was in tremendous pain on palpation around her third through fifth toes and metatarsal areas.  He found her deep tendon reflexes to be in normal limits and that she was well-oriented to herself and in place and

---

[38] The agency physician noted, however, that despite the claims of neuropathy, no damage appeared when she was given a neurological exam.

time.  (R. 565.)    Dr. Miller explained to Plaintiff that if she had a stress fracture, it was common for it not to appear until ten to fourteen days after the injury occurred. Additional x-rays were taken which did not reveal the fracture.  She was put in a fiberglass cast to stabilize her right foot and told to stay off of it.  (R. 567.)  Dr.  Miller referred her to Dr. Lance Trigg who found Plaintiff had a possible hairline fracture or bony contusion at the right fifth toe.  (R. 563.)

Plaintiff also submitted medical records (some of which were already in the record) relating to her visits to St. Anthony Medical Center due to abdominal pain in 2001 and 2003.  (R. 572-604.)  Dr. Robert R. Payton speculated that she had colitis or diverticulitis and recommended a high fiber diet when her colonoscopy revealed nothing abnormal.  (R. 603-604.) When he could not determine the source of her pain through a colonoscopy and biopsy, he recommended exploratory laparoscopy.  This procedure revealed that Plaintiff had abdominal adhesions which the surgeon removed at that time. (R. 607-609.)

In August of 2004, Plaintiff was admitted to the hospital for a mild stroke resulting in facial drooping and expressive dysphagia.  (R. 622-635.) A brain MRI, head and carotid MRA were performed, but all findings were normal.  (R. 636-637.)

## V. DISCUSSION

### A.  "Severe" Impairments

The Plaintiff contends that the ALJ failed to find Plaintiff's complaints of right foot impairment, bilateral carpal tunnel syndrome and shingles severe or discuss the limitations such conditions would have on the Plaintiff's ability to work in 2002.  The Commissioner counters that the ALJ did not need to decide how these impairments

18

(severe or not) would affect the Plaintiff in 2002 because the relevant time frame is the insured period, commencing on the alleged onset date , August 25, 1999, and ending on June 30, 2001.  The Commissioner also points out that the ALJ did consider the relevant evidence in the record pertaining to Plaintiff's right foot, bilateral carpal tunnel, and shingles, but much of the evidence in the record on these conditions occurred *prior* to the alleged onset date.

The ALJ is not required to find all of Plaintiff's impairments severe at step two to proceed to the next step in the sequential evaluation.  In order to proceed past step two, the ALJ is only required to find that the claimant has at least one impairment which affects her ability to perform basic work activities.[39]  The burden is on the Plaintiff to establish that she has a severe impairment, but such a threshold is minimal and easily met.[40]  The ALJ must then take any other impairments into account when determining Plaintiff's RFC at step four.  Here, the ALJ found that the Plaintiff's degenerative disc disease and diabetes mellitus were "severe" at step two, and it is not reversible error that the ALJ did not also find at step two that Plaintiff's right foot impairment, carpal tunnel syndrome, or shingles were severe because the ALJ adequately weighed those impairments in his evaluation at step four.

---

[39] 20 C.F.R. §§ 416.920(c), 416.921(a).  Basic work activities include the following: "1) physical functions such as walking, standing, sitting, lifting, pushing, pulling . . . ; 2) capacities for seeing, hearing, and speaking; 3) understanding, carrying out and remembering simple instructions; 4) use of judgment; 5) responding appropriately to supervision, co-workers and usual work situation; and 6) dealing with changes in a routine setting.  20 C.F.R. § 416.921(b ); *see also* Stokes v. Apfel, No. CA 97-1200-BH-C, 1998 U.S. Dist. LEXIS 16475, at *4 (S.D. Ala. 1998).

[40] McDaniel v. Bowen, 800 F.2d 1026, 1031(quoting Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)).

The ALJ addressed Plaintiff's complaints of right foot impairments, noting that the Plaintiff complained of right foot pain in March of 2000 which was caused by a stress fracture.  A Unna boot and cast foot were used to treat the stress fracture and additional x-rays of the foot revealed calcaneal spurring.[41] (R. 18.)  The ALJ also discussed the removal of Plaintiff's right foot fibromas in 1999 and degenerative joint disease in 2000. (R. 19.)

The ALJ discussed Plaintiff's carpal tunnel syndrome as well, noting that she was examined by Dr. Nelson in 1993 and the results of the electordiagnostic study he performed were compatible with someone who had carpal tunnel syndrome.  (R. 18.) However, as the record discloses, Plaintiff was able to continue working after an operation to correct the carpal tunnel syndrome.[42] (R. 20) Any lasting effects or limitations that carpal tunnel continued to place on her ability to work during the relevant period of insured status are not evident anywhere in the record.

Finally, the ALJ also addressed Plaintiff's recurrent shingles, stating that the Plaintiff suffered from shingles three times in two years, but her last episode lasted six months because it went undiagnosed.  As discussed above, once diagnosed, Plaintiff was able to have her shingles treated and receive some, if not complete, relief from the pain it caused.

In light of this discussion in the ALJ's decision, the Court concludes that the ALJ did not err for failing to find that Plaintiff's right foot impairment, carpal tunnel syndrome,

_____

[41] Calcaneal spurring is spurring of the heel bone.

[42] During the period when Plaintiff was treated for carpal tunnel syndrome (1992-1993), she continued working in the customer service and the shipping and receiving departments of a retail store. No interruption in her work due to this condition is apparent from the record.  (R. 106.)

and shingles were severe.  To the contrary, the ALJ considered these conditions but found for at least two reasons that the evidence of record did not establish that these conditions were disabling. First, the ALJ found that these conditions did not last for the necessary continuous duration during the relevant time frame to establish to make the disability during the insured period.  Second, the ALJ determined in step four, that none of these impairments impinged to a significant extent on Plaintiff's ability to do basic work activities.

**B.  Severity of Plaintiff's Mental Impairments**

Plaintiff claims that the ALJ failed to develop the record as to the severity of Plaintiff's anxiety disorder and depression and failed to obtain vocational expert testimony concerning how such conditions could impact Plaintiff's ability to work.  The burden is on the Plaintiff to submit evidence to prove that she had a medically determinable impairment which impacts her basic work skills.[43] Plaintiff failed to meet this burden as the substantial evidence in the record supports the ALJ's finding that the Plaintiff did not have a severe medically determinable mental impairment during the relevant insured period.

In 1992, Plaintiff allegedly attempted suicide by drug overdose, and in 1996 she was examined by Dr. Berthold who diagnosed her with anxiety disorder with some depressive features.  He found she had no signs of thought disorder or perceptual problems and her short and long-term memory were in tact.  She was no longer having suicidal thoughts.  He recommended she seek additional treatment through medication

---

[43] 20 C.F.R. § 404.1512.

21

and counseling.[44]  While other doctors noted Plaintiff's past medical history of depression (R. 248, 204), the record does not contain any psychiatric reports aside from the report from Dr. Berthold in 1996.

In addition to the medical records, the ALJ discussed the Plaintiff's testimony about her current depressive mood.  However, Plaintiff's testimony concerned her mood in 2002 and thus was not probative evidence of her mood during the relevant period.  Due to the dearth of evidence regarding any mental impairments during the insured period, the ALJ did not err in finding that the Plaintiff did not have a medically determinable mental impairment.  As a result, the there was no need for the ALJ to call a vocational expert or request a consultative examination to develop the record on the effects of a mental impairment between August 1999 and June 2001.

### C. ALJ's Failure to Call a Vocational Expert

Plaintiff contends that she had multiple non-exertional impairments including pain from bulging discs, degenerative disc disease, reoccurring shingles, thoracic and lumbar spondylosis, bilateral carpal tunnel syndrome, uncontrolled brittle diabetes and loss of concentration and depression from her anxiety disorder.  Plaintiff asserts, therefore, that the ALJ should have called a vocational expert to testify about how these non-exertional impairments would limit the work she could do.  The Commissioner raises two arguments in response.  First, the Commissioner asserts that the ALJ properly discredited Plaintiff's complaints of disabling pain.  Second, the Commissioner argues

---

[44] In 1992, Plaintiff had been taking the psychotropic drugs Prozac and Zoloft.  (R. 383, 139.)

that because the ALJ determined that the Plaintiff could perform her past relevant work at step four he was not required to obtain vocational expert testimony.[45]

### 1. The Pain Standard

In reviewing the record, there is substantial evidence to support the ALJ's finding that Plaintiff did not have such debilitating pain as a result of any of her conditions to preclude all gainful work activity.  Pain is a non-exertional impairment.[46] Congress has determined that a claimant will not be considered disabled unless she furnishes medical and other evidence (*e.g.*, medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.[47] Pain alone can be disabling, even when its existence is unsupported by objective evidence,[48] although an individual's statements regarding pain do not provide conclusive evidence of a disability.[49] The ALJ must consider all of a claimant's statements about her symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[50]

An ALJ must apply the Eleventh Circuit's "pain standard" when, as here, a claimant attempts to establish a disability through her own testimony of pain or other

---

[45] Lucas v. Sullivan, 918 F.2d 1567, 1573 n.2 (11th Cir. 1990).

[46] Foote, 67 F.3d at 1559.

[47] 42 U.S.C. § 423(d)(5)(A).

[48] *See* Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).

[49] 42 U.S.C. § 423(d)(5)(A).

[50] 20 C.F.R. § 404.1528.

subjective symptoms.[51] In order to establish a disability based on testimony of pain and other symptoms, the pain standard requires: (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.[52]

In the instant case, the ALJ applied the Eleventh Circuit's pain standard "threshold"[53] assessment to Plaintiff's complaints of pain. Although he did not cite the exact language of the standard, the ALJ's discussion and findings disclose that the pain standard was applied.

After applying the standard to the facts of this case, the ALJ determined that Plaintiff did not meet the standard.  As to the first part of the pain standard, the ALJ found that Plaintiff suffered from various underlying medical conditions that might have caused some pain or limitations, including chronic low back pain, lower lumbar disc bulges, bilateral carpal tunnel syndrome, gallbladder surgery, shingles, diabetes mellitus, and GERD.  (R. 20.)   The ALJ did not find that Plaintiff's anxiety and depression were medically determinable impairments as discussed above.  (R. 18.)

However, with respect to the second and third parts of the standard, the ALJ did not find that there was any objective medical evidence in the record confirming the

---

[51] Foote, 67 F.3d at 1560.

[52] Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).

[53] Marbury 957 F.2d at 839.

severity of the alleged pain arising from that condition or that the objectively determined medical condition was of such a severity that it could have reasonably been expected to give rise to the alleged pain.  (R. 20.) The Eleventh Circuit has stated that where an ALJ discredits a claimant's testimony about subjective complaints, he must articulate explicit and adequate reasons for doing so,[54] or the record must be obvious as to the credibility finding.[55]  While an adequate credibility finding need not cite "particular phrases or formulations [...] broad findings that a claimant lacked credibility and could return to her past work alone are not enough to enable a court to conclude that the ALJ considered her medical condition as a whole."[56] As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.[57] A Court will not disturb a clearly articulated credibility finding supported by substantial evidence of record.[58]

The Court finds that the ALJ *did* articulate explicit and adequate reasons to discredit Plaintiff's testimony about disabling pain, and further finds that the ALJ's reasons are supported by substantial evidence of record.  In evaluating the Plaintiff's complaints of pain, notably the ALJ found that despite such complaints of pain, Plaintiff continued working.  Before and after treatment of her carpal tunnel syndrome in 1992-

---

[54] Wilson, 284 F.3d at 1225.

[55] Foote, 67 F.3d at 1561-62;  Jones v. Dep't of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[56] Foote, 67 F.3d at 1562-1563.

[57] Id. at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

[58] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

1993, Plaintiff was able to work.  During 2000, despite claiming an onset date of August 25, 1999, and despite complaints of right foot pain, Plaintiff worked during 2000 as a bartender and received only routine treatment with a Unna boot.

As to her complaints of back pain, Dr. Pyles' clinical notes and the accompanying MRI from March of 2001 disclose only mild neuropathy, mild disc bulges, moderate degeneration, and no nerve root compression.  (R. 433-436.)  Plaintiff's alleged pain from Shingles was controlled to some extent once diagnosed and improvement was noted in the record.  (R. 452.) While Plaintiff was placed on medication for pain, no other limitations were placed upon Plaintiff's activities, aside from a restriction on driving while taking some of the stronger pain medications.[59]

Accordingly, the ALJ explicitly and adequately articulated reasons to discredit Plaintiff's complaints of disabling pain during her insured status, and all of the reasons the ALJ used to discredit such complaints are amply supported by the record.  Because the task of choosing between conflicting evidence is one that is peculiarly suited to the fact finder,[60] and because there is substantial evidence that supports the ALJ's decision to discredit Plaintiff's complaints of debilitating pain, the Court will not disturb the ALJ's determination that Plaintiff's pain was not so severe as to preclude her from performing light work.

---

[59] Plaintiff also claims that her nonexertional impairments in addition to pain were severe problems due to uncontrolled diabetes and loss of concentration from depression and anxiety.  As previously discussed, there are no incidences of severe problems due to Plaintiff's diabetes in the record and the ALJ properly determined based on the substantial evidence in the record that Plaintiff's depression and anxiety were not medically determinable impairments during the insured period.  As a result,  vocational expert testimony was not needed to address these conditions once the ALJ determined they did not preclude Plaintiff from performing her past relevant work.

[60] Hand v. Heckler, 761 F. 2d 1545,1549 (11th Cir. 1985).

### 2. Past Relevant Work and Vocational Expert Testimony

After finding that Plaintiffs complaints of pain were not credible, the ALJ concluded

at step four of the sequential analysis that the Plaintiff had the capacity to perform the full

range of light work[61] which included her past relevant work as a bartender and office

cleaner.[62]   The burden only shifts to the Commissioner to establish, often by use of a

vocational expert, that there is other work in the economy, when an ALJ has determined

at step four that the Plaintiff *cannot* perform her past relevant work. Where, as here, the

ALJ concludes that the Plaintiff *can* perform her past relevant work and that Plaintiff's

non-exertional impairments do not erode the full range of work at the level of her past

relevant, the burden does not shift to the Commissioner.[63] Because the burden did not

shift to the Commissioner the Commissioner is not required to prove - either through

reliance on the Grids, or through vocational expert testimony - that there are significant

---

[61]Title 20 C.F.R. §416.967 defines "light work" as work which "involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."

[62] The Dictionary of Occupational Titles (2001) defines bartender as one who "[m]ixes and serves alcoholic and nonalcoholic drinks to patrons of bar, following standard recipes." § 312.474-010.
Office Cleaner is defined as one who" keeps [the] premises of [the] office building, apartment house, or other commercial or institutional building in clean and orderly condition." § 381.687-014
However, under this definition, an office cleaner's strength requirement is for heavy work.  The ALJ found that the Plaintiff was capable of doing light work and that her past work experience more appropriately put her in the category of a housekeeping cleaner, defined as one who "[c]leans rooms and halls in commercial establishments, such as hotels, restaurants, clubs, beauty parlors, and dormitories." § 323.687-014.  Even if the Plaintiff's prior work as an office cleaner fit under the former category of cleaner requiring heavy duty work, she could still be found able to perform the less rigorous, light work housecleaning job. Pursuant to 20 C.F.R. §§ 404.1520 (e)- (g) past relevant work does not mean the identical job Plaintiff previously held, but one that is similar based on her previous work experience.  *See also* Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir. 1986.)

[63] Phillips v. Barnhart, 357 F.3d 1232, 1243 (11th Cir. 2004) ("[T]he  ALJ need only determine whether Phillips's nonexertional impairments significantly limit her basic work skills" which "prohibit a claimant from performing a wide range of work at a given level.")(internal quotations omitted); *see also* Foote, 67 F.3d at 1559.

numbers of jobs in the national economy at the work level consistent with Plaintiff's RFC. Accordingly, the ALJ did not err by failing to obtain vocational expert testimony once he determined that the Plaintiff could perform her past relevant work.

### D. <u>Additional Evidence Submitted to the Appeals Council</u>

Plaintiff submitted additional medical records to the Appeals Council covering the time period from 2003 and 2004.  These records were not available in December 2002 at the time of the hearing before the ALJ.  The law in the Eleventh Circuit is that where "the Appeals Council has denied review of the Plaintiff's disability claim, the district court on appeal will only look to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence."[64]  However, Plaintiff submitted this medical evidence to the Appeals Council which received the evidence, made it part of the record, and considered it in denying Plaintiff's request for review.  (R. 8-9, 4.)  When the Appeals Council denies review in such a situation, the decision of the ALJ becomes the final decision of the Commissioner.[65]  Furthermore,  the evidence which was presented to the Appeals Council and not presented to the ALJ (*i.e.*, the new evidence) is incorporated into the record on appeal,[66] and is properly considered by the Court where the claimant appeals the Appeals Council's decision to deny review.[67]

---

[64] <u>Falge v. Apfel</u>, 150 F.3d 1320, 1323 (11th Cir. 1998).

[65] *I d.* at 1322 (citing <u>Keeton v. Dep't of Health and Human Servs.</u>, 21 F. 3d 1064, 1066 (11th Cir. 1994)).

[66] *Id.*

[67] *See* <u>Baguer v. Apfel</u>, 65 F. Supp. 2d 1345, 1354 (M.D. Fla. 1999) ("The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that the ALJ's action, findings, or conclusions are contrary to the weight of the evidence currently

(continued…)

Conversely, it would be improper for the Court to consider the new evidence where the claimant appeals only the ALJ's decision to deny benefits.[68]

Therefore, construing Plaintiff's argument as a direct challenge to the decision of the Appeals Council denying review of her case,[69] Plaintiff must make a three-part showing in order to succeed on her request for remand. First, she must show that new, non-cumulative evidence exists. Second, she must show that the evidence is material such that a reasonable possibility exists that the new evidence would change the administrative result. Lastly, she must demonstrate that good cause exists for her failure to submit the evidence at the appropriate administrative level.[70] As explained below, Plaintiff has failed to make such a showing in this case.

The evidence submitted to the Appeals Council was new and not cumulative, satisfying the first prong of the test.  The medical evidence covers an injury to Plaintiff's right foot, medical records on plaintiff's abdominal adhesions, and stroke.  However, this evidence does nothing to advance Plaintiff's ability to satisfy the second prong of the test (*i.e.*, to show that the evidence is material such that a reasonable possibility exists that the new evidence would change the administrative result).  Here, there is no such possibility.

---

[67](…continued)
of record.")

[68] Falge, 150 F.3d at 1323.

[69] Although Plaintiff makes no argument in her memorandum as to how the Appeals Council erred, the Court notes that her complaint specifically states that the instant action is an appeal from the Appeal Council's decision denying review. *See* Doc. 1, Complaint, at ¶ 4.

[70]Falge, 150 F.3d at 1323 (citing Cannon v. Bowen, 858 F. 2d 1541 (11th Cir. 1988)).

The evidence of injury to Plaintiff's right foot was not related to the previous problems Plaintiff had with her right foot in 2000.  To the contrary, the stress fracture in 2003 was directly caused by bumping into a chair on February 19, 2003 and would have no bearing on the Appeals Council's determination of disability for the period from August 25, 1999 through June 30, 2001.  (R. 563-567.)   Likewise, the removal of Plaintiff's abdominal adhesions in 2003, which may have caused some of her abdominal problems in 2001, was of little relevance in this case, because Plaintiff has not asserted that such a condition was an impairment interfering with her basic work activities during the August 25, 1999 - June 30, 2001 time frame.  (R.  572-618.)

Lastly, the mild stroke Plaintiff had in 2004 was a completely new condition that was not present at the time for which she was claiming disability.  (R. 620-641.)  While Plaintiff's diabetes, high blood pressure, and high cholesterol (all present from 1999-2001) may have contributed to the stroke she had in 2004, those conditions were not found to impair her basic work abilities during the insured period.  The stroke itself, and the mild impairment of speech it caused, are not the subjects of disability in this case and have no bearing on the decision of the ALJ or the Appeal's Council that Plaintiff was not disabled between August 25, 1999 and June 30, 2001.

With respect to the third prong, while there was good cause for Plaintiff's failure to submit this evidence to the ALJ--she did not yet have these medical reports--the information contained in these reports is not material and would not affect the outcome of this appeal.  Accordingly, there is no basis to remand this case for reconsideration in light of the new evidence.

## VI. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of

the Commissioner be **AFFIRMED**.

**IN CHAMBERS** in Ocala, Florida, on December 29, 2005.

GARY R. JONES
United States Magistrate Judge

Copies to:
    Honorable Wm. Terrell Hodges
    Senior United States District Judge

    Counsel of Record